UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NADARAJAH VIKNESRAJAH, A95-665-546,

                              Petitioner,        No. 09-CV-6442 CJS

   -vs-

                                                DECISION AND ORDER

OFFICER KOSON, Officer in Charge, U.S.
Immigration & Customs Enforcement, et al.,

                              Respondents.
_____

APPEARANCES

For Petitioner:              Visuvanathan Rudrakumaran, Esq.
                                875 Avenue of the Americas
                                Suite 2309
                                New York, New York 1001

For Respondents:          Gail Y. Mitchell, Esq.
                                Assistant United States Attorney
                                138 Delaware Avenue
                                Buffalo, New York 14202

INTRODUCTION

      Nadarajah Viknesrajah ("Petitioner") is a native and citizen of Sri Lanka , who has been administratively found to be inadmissible to the United States. Petitioner concedes that he is removable, and currently has an application pending before an Immigration Judge ("IJ") for asylum and withholding of removal under the Convention Against Torture ("CAT"). In the meantime, Petitioner has been detained by the Department of Homeland Security ("DHS") since October 3, 2008, pursuant to Immigration and Nationality Act ("INA"), 8 U.S.C. § 1225(b)(1)(B)(ii). Petitioner seeks habeas relief under 28 U.S.C. §

1

2241, claiming that Respondents' decision to deny him "parole" from detention pending the resolution of his administrative proceeding was arbitrary and capricious, and that his continued detention violates due process. For the reasons that follow, the petition is denied.

LEGAL STANDARD

Petitioner brings this action pursuant to 28 U.S.C. § 2241(c)(3), which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)).

When an inadmissible alien applies for asylum in the United States, U.S. immigration officials interview the alien to determine whether he has "a credible fear of persecution" in his native country, and if so, "the alien shall be detained for further consideration of the application for asylum." 8 U.S.C. § 1225(b)(1)(B)(ii). The U.S. Attorney General may, "in his discretion parole[1] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). However, such parole is only for a limited time and a limited purpose:

> [P]arole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney

---

[1] *See, Zheng v. Gonzales*, 422 F.3d 98, 117 (3rd Cir. 2005) ("Parole is a form of relief from immigration *detention*; it is not a form of relief from *removal proceedings*, and when the purposes of parole have been served the parolee must be returned to custody and removal proceedings must continue.") (emphasis in original; citation omitted).

2

> General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

*Id*. To obtain such parole, the alien must demonstrate to the local district director that he qualifies:

> Under the regulations promulgated pursuant to [8 U.S.C. § 1182(d)(5)], the Attorney General has vested his discretion whether to grant parole in the district director of the district where the alien is in custody. 8 C.F.R. § 212.5(a).
>
> The regulations limit the class of aliens whose situations meet the "urgent humanitarian reasons" or "significant public benefit" standards to those aliens (1) who have serious medical conditions rendering continued detention inappropriate; (2) who are pregnant women; (3) who are juveniles; (4) who will be witnesses in judicial, administrative, or legislative proceedings in the United States; or (5) whose continued detention is not in the public interest as determined by INS officials. 8 C.F.R. § 212.5(b).

*Thevarajah v. McElroy*, No. 01-CV-3009, 2002 WL 923914 at *2 (E.D.N.Y. Apr. 30, 2002). In addition to showing that he fits within one of the five categories above, the alien must also show that he "present[s] neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). However, before demonstrating the foregoing factors, as a threshold matter the alien must establish his identity and nationality. *Wangchuck v. Department of Homeland Security, Immigration*, 448 F.3d 524, 528 (2d Cir. 2006) ("[A] petitioner's nationality, or lack of nationality, is a threshold question in determining his eligibility for asylum.") (citation and internal quotation marks omitted); *In re O-D-*, 21 I. & N. Dec. 1079, 1081, 1998 WL 24904 (BIA Jan. 8, 1998) ("A concomitant to [an asylum] claim is the burden of establishing identity, nationality, and citizenship.").

District courts do not have jurisdiction to consider challenges to discretionary

decisions denying parole to aliens seeking asylum. It is true that in *Bertrand v. Sava*, 684 F.2d 204, 210 (2d Cir. 1982), the Second Circuit determined that federal courts had jurisdiction to review such decisions, and that,

> as long as the Attorney General exercises his broad discretion under 8 U.S.C. s 1182(d)(5) to determine whether unadmitted aliens may be paroled pending final determination of their applications for admission to the United States, his decision may not be challenged on the grounds that the discretion was not exercised fairly in the view of a reviewing court or that it gave too much weight to certain factors relevant to the risk of abscondence and too little to others. . . . The discretion may not be exercised to discriminate invidiously against a particular race or group or to depart without rational explanation from established policies. Such exercise of the power would not be "legitimate and bona fide" . . . . But the Attorney General's exercise of his broad discretionary power must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary. The burden of proving that discretion was not exercised or was exercised irrationally or in bad faith is a heavy one and rests at all times on the unadmitted alien challenging denial of parole.

*Id*. at 212 (citations and footnotes omitted). However, Congress subsequently enacted 8 U.S.C. § 1252(a)(2)(B)(ii), which indicates in pertinent part that "no court shall have jurisdiction to review - . . . any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title." Consequently, this Court lacks jurisdiction to review discretionary decisions concerning parole. *See, e.g., Bolante v. Keisler*, 506 F.3d 618, 621 (7th Cir. 2007) ("The Attorney General can and often does release the alien on parole, 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5, but his decision to do so is not judicially reviewable. 8 U.S.C. § 1252(a)(2)(B)(ii)."). The Court, though, retains jurisdiction to review constitutional claims and questions of law,

pursuant to 8 U.S.C. § 1252(a)(2)(D). *See, Serpil v. Gonzales*, No. 05-3022-ag, 220 Fed.Appx. 10, 11, 2007 WL 841591 at *1 (2d Cir. Mar. 19, 2007) ("[T]he jurisdictional bar in Section 1252(a)(2)(B)(ii) is subject to the exception for petitions raising 'constitutional claims or questions of law[.]'") (citing 8 U.S.C. § 1252(a)(2)(D)) (unpublished).

## BACKGROUND

In 2004, Petitioner attempted to enter the United States without a valid passport or other valid entry document, and DHS took him into custody and commenced removal proceedings. While removal proceedings were pending, DHS released Petitioner on his own recognizance, and Petitioner left the U.S. and went to Canada to pursue an application in Canada for refugee status. In August 2004, an IJ entered a final order of removal against Petitioner in his absence. Petitioner remained in Canada for approximately four years, but was denied refugee status. On October 3, 2008, Petitioner returned to the U.S. from Canada, and was again taken into custody by DHS. Specifically, Canada returned Petitioner to the U.S., pursuant to the Reciprocal Agreement[2] between the two countries concerning foreign nationals who make refugee claims at the U.S./Canadian border.

Subsequently, officials in DHS's Asylum Division decided to allow Petitioner to pursue his asylum claim in the U.S., even though Petitioner ordinarily would have been barred from doing so, pursuant to the Safe Third Party Agreement between the U.S. and

---

[2] *See, In re R-D-*, 24 I&N Dec. 221, 222, n. 1 (BIA 2007): "On July 24, 1987, immigration officials of Canada and the United States signed the Reciprocal Arrangement between the United States Immigration and Naturalization Service and the Canada Employment and Immigration Commission for the exchange of deportees between the United States and Canada. It is currently referred to as the Reciprocal Agreement and is contained in the Appendix to Operations Instructions 243.1(c)(2). *See* 16 Charles Gordon et al., Immigration Law and Procedure 809-17, App. 243.1(c)(2) (rev. ed. 1993)."

Canada, since he had already unsuccessfully pursued refugee status in Canada. In that regard, DHS officials found that it was in the public interest to allow Petitioner to pursue his asylum claim in the U.S., because returning him to Canada might have violated the Reciprocal Agreement between the U.S. and Canada. *See*, Petition [#1], Exhibit A, DHS internal memo concerning "Request for Public Interest Exception to the Safe Third Country Agreement" ("It is in the public interest to allow the applicant to pursue his claim for asylum in the United States as his return to Canada by the United States may violate the Reciprocal Agreement.") In other words, although Petitioner would ordinarily have been barred from pursuing an asylum claim in the U.S. pursuant to the Safe Third Country Agreement, DHS officials made a discretionary decision to invoke the "public interest" exception to that agreement, and allow Petitioner to apply for asylum in the U.S., in order to avoid breaching the separate Reciprocal Agreement between the U.S. and Canada.[3]

Subsequently, DHS interviewed Petitioner and found that he had a credible fear of persecution in Sri Lanka. DHS detained Petitioner pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii) and placed him in removal proceedings. Petitioner conceded that he was removable as charged, and applied for asylum and withholding of removal under the CAT. Petitioner's asylum and CAT applications are apparently still pending. Petitioner's

---

[3] U.S.-Canada Agreement Regarding Cooperation in the Examination of Refugee Status Claims - "Safe Third Country", U.S. Dep't of Justice Executive Office of Immigration Review (EOIR) Operating Policies & Procedures Memoranda Office of the Chief Immigration Judge, FIM-OPPM 04-09, 2004 WL 3161254 (OPPM Dec. 28, 2004) ("Public Interest Determinations Reserved to DHS - An alien in removal proceedings who is otherwise ineligible to apply for asylum under the Agreement may pursue their claims in the U.S. if DHS files a written notice in the proceedings before the immigration judge that it has decided in the public interest to allow the alien to pursue his/her claims.")

case was scheduled for trial before an IJ on December 14, 2009, and although Petitioner's reply/traverse was submitted after that date, he did not indicate the outcome of the trial, or the present procedural posture of his removal proceedings.

In the meantime, since October 3, 2008, Petitioner has remained in DHS custody. On three occasions Petitioner has unsuccessfully applied for discretionary parole, pursuant to 8 U.S.C. § 1182(d)(5)(A). On December 26, 2008, DHS denied Petitioner's parole application, because he did not have proof of his identity. Petitioner subsequently provided proof of his identity and reapplied for parole. On April 13, 2009, DHS denied Petitioner's application, stating, "You have failed to demonstrate that your parole would be justified for urgent humanitarian reasons or would yield a significant public benefit." Docket [#4-3] at 11. On July 1, 2009, DHS again denied Petitioner parole, repeating that "You have failed to demonstrate that your parole would be justified for urgent humanitarian reasons or would yield a significant public benefit." *Id*. at 9.

On August 27, 2009, Petitioner commenced this action. Petitioner argues that his detention is unlawful for two reasons: 1) the length of detention is unreasonable and violates due process, pursuant to *Zadvydas v. Davis*, 533 U.S. 678 (2001) ("*Zadvydas*") and *Demore v. Kim*, 538 U.S. 510, 123 S.Ct. 1708 (2003) ("*Demore*"); and 2) DHS's decision denying him parole was arbitrary and capricious. Respondents oppose the application.

DISCUSSION

From the discussion above it is clear that the Court does not have jurisdiction to review the discretionary decision whether to grant parole under 8 U.S.C. § 1182(d)(5)(A). Petitioner contends that the decision denying him parole was arbitrary and capricious for

several reasons. First, he argues that DHS gave "shifting reasons" for denying his application. Second, he states that DHS treated him unequally, since Sri Lankans are often granted parole. And third, he argues that DHS should have found that it was in the public interest to release him on parole, since DHS had already found that it was in the public interest to allow him to pursue his asylum claim in the U.S. The Court finds that review of all of these arguments is barred by 8 U.S.C. § 1252(a)(2)(B)(ii), since each involves discretionary decisions. Moreover, even assuming *arguendo* that any of these arguments raise "questions of law" that the Court can review under 8 U.S.C. § 1252(a)(2)(D), they lack merit.

For example, there is nothing improper about the fact that DHS gave different reasons for denying Petitioner's application. On this point, Petitioner maintains that DHS unfairly changed its rationale for denying him parole, by initially indicating that he had failed to prove his identity, and then later by indicating that he had failed to show that his parole would be justified for urgent humanitarian reasons or would yield a significant public benefit. Petition [#1] at ¶¶ 38, 40. However, the Court disagrees. As discussed above, a threshold requirement in any asylum case is that the alien establish his identity and nationality to DHS's satisfaction. When Petitioner first applied for parole he had not yet established his identity. Consequently, DHS was entitled to deny his parole application on that basis, without considering whether he otherwise qualified for parole. After Petitioner provided proof of his identity and nationality and reapplied for parole, DHS denied the application because he did not meet other criteria for parole. Such facts do not indicate that DHS's determinations were arbitrary, capricious, or otherwise unlawful.

Similarly, Petitioner has not shown that DHS acted arbitrarily by denying his petition while granting parole to other Sri Lankans. On this issue, Petitioner alleges in conclusory fashion, based on hearsay information provided by his attorney, that other Sri Lankans have been granted parole:

> The arbitrary nature of the denial of parole is also highlighted by the fact that people of Sri Lankan origin who are similarly situated to Nadarajah Viknesrajah have been granted parole. Petitioner's counsel has represented and continues to represent many individuals of Tamil origin from Sri Lanka who are similarly situated to Petitioner who have been granted parole.

Petition [#1] ¶ 41. Such conclusory statements about "similarly situated" Sri Lankans fail to show that Petitioner is entitled to habeas relief.

Petitioner also contends that DHS's decision to deny him parole was arbitrary and capricious because it relied on conflicting standards with regard to whether his application was in the "public interest." On this point, Petitioner argues that aliens whose "continued detention is not in the public interest" are eligible for parole under 8 C.F.R. § 212.5(b)(5), and that DHS necessarily determined that his detention was not in the public interest when it decided to allow him to pursue his asylum claim in the U.S., instead of in Canada. However, the Court again disagrees since Petitioner's argument completely misunderstands the nature of the decision that DHS made in permitting him to apply for asylum in the U.S. As discussed earlier, DHS decided that it was in the public interest to allow Petitioner to apply for asylum in the U.S. because sending him back to Canada would have violated the Reciprocal Agreement between the two countries. Such decision had nothing to do with whether it would be in the public interest to release Petitioner on parole pending the outcome of his asylum application.

9

The Court will next consider Petitioner's argument that his continued detention violates the Due Process Clause, pursuant to *Zadvydas* and *Demore*. The Court has jurisdiction to consider such constitutional argument pursuant to 8 U.S.C. § 1252(a)(2)(D). In *Zadvydas*, the Supreme Court held that indefinite detention of a criminal alien, following the entry of a final order of removal, under INA § 241, would violate the Due Process Clause. In *Demore*, the Supreme Court held that mandatory detention of criminal aliens pursuant to INA § 236(c), prior to a final order of removal, did not violate due process. In *Demore*, a deportable alien challenged his mandatory detention pending the outcome of his removal proceedings, on the grounds that 8 U.S.C. § 1226(c) violated the Fifth Amendment's Due Process Clause. There, the alien argued that such mandatory detention was unnecessary, and that the government could instead conduct "individualized bond hearings." *Id*., 123 S.Ct. at 1720. The Court rejected that argument, in keeping with its "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Id*., 123 S.Ct. at 1719. On this point, the *Demore* decision noted that, based on then-current statistics, detention under 8 U.S.C. § 1226(c) "lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id*., 123 S.Ct. at 1721. The Court observed that while such detention would be unconstitutional if it was "'indefinite' and 'potentially permanent,'" detention under INA § 236(c) was typically "of a much shorter duration." *Id*., 123 S.Ct. at 1720 (citing *Zadvydas*). However, the Court did not set any time limits on the Government's ability to detain aliens under § 236(c). In a

concurring opinion, Justice Kennedy observed that, "since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien [subject to mandatory detention under 8 U.S.C. § 1226(c)] could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Id*., 123 S.Ct. at 1722 (Kennedy, J., concurring) (citing *Zadvydas*).

Subsequently, in *Nadarajah v. Gonzales*, 443 F.3d 1069 (9th Cir. 2006) ("*Nadarajah*"), the Ninth Circuit applied *Zadvydas* and *Demore* to the case of an inadmissible Sri Lankan who, like Petitioner, was detained pursuant to 8 U.S.C. § 1252(a)(2)(D). Unlike Petitioner, however, the alien in *Nadarajah* had been detained five years, despite having prevailed in all of his administrative proceedings. *Id*. at 1073-1075. Although having been granted asylum and protection under the CAT, the alien potentially faced further discretionary review by the Attorney General, with no estimated timeline for such review. *Id*. at 1075, 1081. The Circuit Court held that § 1252(a)(2)(D) did not authorize the alien's "indefinite detention," and ordered that the alien be released from custody, since he had shown that there was "no significant likelihood of removal in the reasonably foreseeable future," and since the government had failed to rebut such showing. *Id*. at 1080, 1082.

On the entire record here, the Court finds that Petitioner's continued detention is reasonable.[4] The instant case is factually distinguishable from the situation in

---

[4] Although the parties have not briefed this issue, it appears that inadmissible aliens such as Petitioner have less constitutional due process rights than the admissible aliens in *Zadvydas* and *Demore*. *See, Guzman v. Tippy*, 130 F.3d 64, 66 (2d Cir. 1997) ("Indefinite detention of excludable aliens does not violate due process.") (pre-*Zadvydas*); *Ascencio-Rodriguez v. Holder*, 595 F.3d 105, 109 n.3 (2d Cir. 2010) ("It is well established that aliens detained at the border are not entitled to the same protections as

*Nadarajah*. Petitioner has been in custody a much shorter period, and he has not as yet prevailed on his applications for discretionary relief. Petitioner is removable and there is nothing preventing his deportation to Sri Lanka in the event that his appeals are denied. Additionally, Petitioner was already denied asylum in Canada, and it is statistically unlikely that he will prevail on his asylum claims in this Country. *See, Nadarajah*, 443 F.3d at 1081 ("Of asylum cases reviewed on the merits, the rate of denial was 62%. Immigration judges denied the relief of withholding of removal in 87% of the cases heard on the merits. Relief under the Convention Against Torture is awarded even more rarely. During FY 2005, the grant rate by immigration judges was approximately 2%.") (citing Executive Office for Immigration Review data from 2005; specific citations omitted).

Moreover, the reason for the delay in this case is unclear. According to Petitioner, his trial before an IJ on his asylum and CAT claims was scheduled to occur on December 14, 2009, and the Court can only assume that he is currently appealing an unfavorable ruling. However, the delay caused by Petitioner's attempts to seek discretionary relief cannot be used by him to establish a due process violation. *See, Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991) ("Although [the alien-petitioner's] litigation strategy is perfectly permissible, we hold that [he] may not rely on the extra time resulting therefrom to claim that his prolonged detention violates

---

those who have been admitted into the United States."); *Kiyemba v. Obama*, 555 F.3d 1022, 1028 (D.C. Cir. 2009) ("It is true that *Zadvydas* spoke of an alien's due process rights, but the [Supreme] Court was careful to restrict its statement to aliens who had already entered the United States."), *vacated and remanded on other grounds*, 130 S.Ct. 1235 (2010); *Nadarajah*, 443 F.3d at 1077 ("The [Supreme Court in *Clark v. Martinez*, 543 U.S. 371, 125 S.Ct. 716 (2005), extending the holding in *Zadvydas* to inadmissible aliens,] did not decide that the indefinite detention of inadmissible aliens presented the same constitutional problems in the same degree as the detention of admissible aliens. To the contrary, the Court relied on the statute's applicability to admitted aliens and the necessity of consistent [statutory] interpretation[.]") (citation omitted).

substantive due process."); *Miller v. Shanahan*, No. 09 Civ. 9712 (WHP), 2010 WL 481002 (S.D.N.Y. Jan. 29, 2010) (Two-and-one-half year detention under INA § 236(c) did not violate alien's due process rights, where delay was not attributable to the Government, but instead was attributable to the alien's attempts to obtain cancellation of removal and to appeal his final administrative order of removal, and where the primary purpose behind INA § 236(a), "curbing the risk that a deportable alien will flee," remained relevant.).

## CONCLUSION

Accordingly, the petition is denied and this action is dismissed. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right.

So Ordered.

Dated: Rochester, New York
     January 18, 2011

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge